Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| E.V., and L.V., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE OXFORD, UNITED BEHAVIORAL HEALTH <br><br> Defendants. | COMPLAINT <br><br> Case No. 1:21-cv-00126 - JNP |

Plaintiffs E.V. and L.V., through their undersigned counsel, complain and allege against

Defendants United Healthcare Oxford, and United Behavioral Health (collectively "United") as

follows:

**PARTIES, JURISDICTION AND VENUE**

1.  E.V. and L.V. are natural persons residing in Morris County, New Jersey. E.V. is L.V.'s

    father.

2.  United Healthcare Oxford is an affiliate of the nationwide UnitedHealthcare network of

    insurers headquartered in Hennepin County, Minnesota and was the insurer and claims

1

administrator, as well as the fiduciary under ERISA, for the medical benefits plan

providing coverage for the Plaintiffs ("the Plan") during the time the treatment at issue in

this case was provided.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et.*
   *seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). E.V. was a
   participant in the Plan and L.V. was a beneficiary of the Plan at all relevant times.

4. L.V. received medical care and treatment at Elevations RTC ("Elevations") from
   November 8, 2018, to November 5, 2019. Elevations is a licensed treatment facility
   located in Davis County Utah, which provides sub-acute inpatient treatment to
   adolescents with mental health, behavioral, and/or substance abuse problems.

5. United, acting in its own capacity or under the brand name Optum, denied claims for
   payment of L.V.'s medical expenses in connection with her treatment at Elevations.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C.
   §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on
   ERISA's nationwide service of process and venue provisions, because United does
   business in Utah, and the treatment at issue took place in Utah. In addition, venue in Utah
   will save the Plaintiffs costs in litigating this case. Finally, in light of the sensitive nature
   of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the
   State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the
   benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for
   appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants'

violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### L.V.'s Developmental History and Medical Background

9. From a young age L.V. suffered from anxiety and would have frequent panic attacks. By the time she got to high school, L.V. started seeing a therapist and a psychiatrist. These sessions revealed that L.V. struggled with suicidal ideation, body image issues, and urges to self-harm.

10. L.V. was admitted to a partial hospitalization program, however she refused to contract for safety and was hospitalized at a facility called Carrier Clinic. A few days before Christmas in 2017, one of L.V.'s friends committed suicide and L.V. became extremely depressed. She was then readmitted to Carrier and afterwards received additional partial hospitalization treatment. L.V. also required surgery due to a mass which needed to be removed which led to complications and a second emergency surgery. As a result of this experience L.V. developed post-traumatic stress disorder.

11. L.V. continued outpatient therapy but it was only marginally effective. She would often trash her bedroom, was very manipulative, constantly lied, and isolated herself. L.V. was again hospitalized and received a conditional diagnosis of bipolar disorder and borderline personality disorder. L.V.'s treatment team recommended that she receive care in an inpatient facility like a therapeutic boarding school. L.V. continued to receive outpatient treatment but often refused to attend or participate.

12. L.V. had some confrontations with her friends and her parents which were difficult for her. Following a particularly difficult therapy session L.V. took a shower and self-harmed repeatedly by cutting her arms and legs with razor blades. L.V. screamed and when her self-harm was discovered, L.V. stated that she could not remember cutting herself although she was bleeding profusely. E.V. found a cache of additional razor blades L.V. had hidden in her room.

13. Shortly afterwards after being caught performing a sex act with her boyfriend, L.V. broke down and started self-harming by burning herself with a curling iron. L.V. refused to speak to her therapists and was taken to Elevations via a crisis transportation company.

**Elevations**

14. L.V. was admitted to Elevations on November 8, 2018, with United's approval.

15. In a letter dated May 21, 2019, signed by Linda Gordon, M.D., United denied payment for L.V.'s treatment from May 18, 2019 forward. The letter stated in pertinent part:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Level of Care, it is my determination that no further authorization can be provided from 05/18/2019 forward.
>
> You were admitted for treatment of depression. After talking with your doctor's designee, it is noted you have made progress and that your condition no longer meets Guidelines for further coverage of treatment in this setting.
>
> - You have improved with treatment.
> - You are less depressed.
> - You are maintaining your safety.
> - You are not having thoughts of harming self or others.
> - You have not been violent or aggressive.
> - You have no concerning medical issues.
> - You can continue your treatment in a less intensive treatment setting.
>
> Instead, your care and recovery could continue care [sic] in the Mental Health Partial Hospitalization Program setting. You can receive treatment for 20 or more hours weekly in the program.

16. On November 11, 2019, E.V. submitted a level one appeal of the denial of payment for L.V.'s treatment. E.V. stated that L.V.'s treatment was provided based on the "adamant recommendations" of her treatment providers who all agreed that additional residential treatment was warranted.

17. E.V. reminded United of its responsibilities under ERISA including its obligations to take into account all of the information he had submitted, to utilize appropriately qualified reviewers and to disclose their identities, to provide him with the specific reasoning for the adverse determination, to give him the information necessary to perfect the claim, to act in his best interest, and to provide him with a full, fair, and thorough review.

18. E.V. contended that the guidelines utilized by United were irredeemably flawed and that United's denial letter linked him to its current guidelines and not the ones that were in effect at the time L.V. received treatment. He referenced a court decision in *Wit, et.al., v. United Behavioral Health* in which United's proprietary guidelines were found to violate generally accepted standards of medical practice on several counts including overemphasizing acuity and crisis stabilization and forcing insureds into a lower level of care regardless of whether such treatment was effective.

19. E.V. wrote that while the *Wit* court specifically analyzed United's guidelines which were in effect between 2011 and 2017, United's guidelines continued to violate generally accepted standards of medical practice in the same manner the court had found to be impermissible in *Wit.* E.V. asked United to rely on the terms of his insurance policy rather than proprietary guidelines.

20. E.V. noted that United did not have specific criteria for children and adolescents despite the fact that children and adolescents had significantly different needs than adults, and

treatment plans which would be perfectly acceptable for adults would not be appropriate for children and vice versa.

21. E.V. additionally contended that United relied on acute level factors to justify its decision to deny care such as "You are maintaining your safety," "You are not having thoughts of harming self or others," and "You have not been violent or aggressive." He wrote that these were inappropriate metrics to evaluate the necessity of residential treatment and that United's observations that L.V. had improved with treatment and was less depressed simply showed that the residential treatment she was receiving was effective.

22. E.V. wrote that MHPAEA compelled insurers to offer behavioral health coverage "at parity" with comparable medical or surgical treatment. E.V. identified skilled nursing facilities as one of the medical or surgical analogues to the residential treatment provided to L.V.

23. E.V. argued that United did not require individuals receiving skilled nursing care to satisfy acute level symptoms and, in fact, did not appear to have specific criteria for skilled nursing care at all. E.V. contended that requiring mental health providers to satisfy a litany of requirements listed only in proprietary criteria while not only exempting medical or surgical providers from these requirements but having no medical or surgical criteria drafted at all was a nonquantitative treatment limitation in violation of MHPAEA. E.V. also pointed out that United's requirement for its insureds to meet acute criteria for a nonacute level of care also violated MHPAEA.

24. E.V. wrote that non-acute facilities were "neither expected to treat nor equipped to handle" individuals suffering from acute level symptoms. E.V. requested that United conduct a parity analysis of the Plan to assess its MHPAEA compliance and asked to be

provided with a physical copy of the results of this analysis. E.V. argued that he was
entitled to these materials under MHPAEA.

25. E.V. referenced another court decision, *Dominic W. v. Northern Trust Company
Employee Welfare Benefit Plan,* where an insurer was similarly reprimanded for requiring
acute level symptoms to qualify for non-acute residential treatment, as well as
disregarding the opinions of treating providers and only conducting a file review, failing
to account for the patient's historic failure in other levels of treatment, and cherry-picking
evidence from the medical record to support a predetermined conclusion.

26. E.V. argued that United was also engaging in behaviors the court had found to be
impermissible in *Dominic W.* He pointed out that United had authorized a significant
portion of L.V.'s treatment and during this time it never asked her to meet acute level
symptoms, but as soon as it elected to deny payment it suddenly required her to meet
acute level factors.

27. He also contended that United had arbitrarily chosen May 17, 2019, as the last day to
provide coverage. He pointed out that nothing in the medical records suggested that she
was ready to be discharged on that date and her medical records before and after that date
were "essentially the same." E.V. accused United of denying payment based solely on
"preconceived notions about the maximum length of stay" rather than the actual facts of
L.V.'s case.

28. E.V. contended that L.V.'s treatment was medically necessary and it met the
requirements outlined in his insurance policy. He included copies of L.V.'s medical
records with the appeal, which showed that she continued to self-harm while in treatment,

sexually acted out, struggled with disordered eating, anxiety, and also included other incidents where she punched the walls and damaged property.

29. E.V. requested that in the event United upheld the denial that it provide him with a copy of the specific reasons for the determination along with any corresponding evidence, any administrative service agreements that existed, any clinical guidelines or criteria used to evaluate the claim, any mental health, substance use, skilled nursing, inpatient rehabilitation, or hospice criteria used to administer the Plan, and any reports or opinions from any physician or other professional regarding the claim. (collectively the "Plan Documents") E.V. stated that he was entitled to these materials as they were documents under which the Plan was operated.

30. E.V. included letters of medical necessity with the appeal. Elizabeth Rose wrote in a letter dated July 18, 2019:

> Given the persistence of her symptoms, with increasing severity and escalation to suicidal ideation and self harm and despite continued day and outpatient therapy and medication monitoring by a psychiatrist, a more intense level of treatment became necessary. A residential level of care would be necessary to achieve significant and lasting improvement of [L.V.]'s mental health issues. I consider this to have been medically necessary…

Nicole Rafanello, Ph.D., wrote in a letter dated July 3, 2019:

> [L.V.] attended one individual appointment per week and one DBT group skills-training session per week at my office, with additional appointments being offered as needed. She was a high risk patient who presented with a history of trauma, PTSD, anxiety, conflict in interpersonal relationships and suicidal ideation. Her primary diagnoses include Bipolar-II disorder and Major Depressive Disorder. Secondary diagnoses include Bulimia Nervosa and Borderline Personality Disorder….
>
> As [L.V.] continued to struggle with her symptoms and was minimally engaged while in treatment, it was determined that a structured environment with academic and therapeutic supports was required. She was placed in a Residential Treatment Facility in Utah in November 2018 and it is expected that residential treatment will be required for the foreseeable future.

31. E.V. stated that the providers who had treated L.V. on a first-hand basis believed her treatment to be medically necessary. She asked United to specify on what basis it disagreed with the providers who had treated L.V. in person.

32. In a letter dated December 12, 2019, United upheld the denial of payment for L.V.'s treatment from November 16, 2019, forward. The letter appears to have copy and pasted the language from the May 21, 2019, denial letter nearly word for word. The review was attributed to Neal Satten, M.D., although it is unclear what, if any analysis, Dr. Satten conducted because as noted above, the letter recycled the previous denial essentially verbatim with no indication that anything more than the most cursory review took place.

33. On March 2, 2020, E.V. submitted a complaint to the New York Department of Financial Services. ("NYDFS") He stated that he had contacted United[1] on multiple occasions to inquire about the status of his appeal and was told that it had been split into two appeals, one for dates November 15, 2019 and prior, and one after that date.

34. E.V. contended that United had processed the incorrect dates of service and upon investigation he also discovered that United had incorrectly processed his appeal as a provider appeal. He detailed his attempts to get United to process the appeal properly and to include the correct dates of service.

35. He stated that he was told the appeal had been reprocessed and rereviewed as if it were a member appeal. However, despite United's claim that it had done so, all it did was change the date in the upper right corner without making any other substantive changes. He wrote that he again contacted United and was again assured that the appeal would be

---

[1] E.V.'s contact was done through a representative.

reprocessed but as of the submission of his complaint, he had yet to receive a copy of the corrected appeal.

36. On March 9, 2020, United responded to the complaint. United stated that it had split the appeal into two date ranges because L.V. had since been discharged and due to this fact, it elected to split the dates. United stated that it had initially erroneously reviewed the appeal as a provider appeal but it had subsequently corrected the error and conducted "an additional review" on March 5, 2020, wherein the denial was upheld. NYDFS sent a letter to the Plaintiffs on March 19, 2020, stating that it did not have further authority to assist.

37. The provider denial letters referenced by E.V. in his complaint consisted of two letters dated December 17, 2019, and one corrected letter dated March 5, 2020. The first two letters were largely identical except the dates of service were different. The third letter dated March 5, 2020, was marked as a corrected letter. The corrected letter made some minor changes, the largest of which removed language stating that the claims had been authorized and sent for processing.

38. These three letters incorrectly stated that they were drafted in response to a provider appeal. All three letters were signed by Kenneth Fischer, MD. and gave the following justification for the denial:

> The member was admitted for the intensive treatment of her mood, behavior and eating related symptoms on 11/06/2018. Optum authorized care through 05/17/2019. As of date of service 05/18/2019, she appeared to have made substantial progress in treatment. Her acute symptoms had been stabilized. There were no treatment plans or goals specific to her symptoms and behaviors that required ongoing 24-hour-a-day, 7-day-a-week supervision and care. The why now factors leading to her residential treatment admission appeared to be able at that point to be safely treated in a less intensive setting. She was noted to be generally more cooperative, responsive to staff, medication adherent, and doing better. She presented minimal acute behavioral management challenges. She was

psychiatrically stable, with no report of self harm, aggression, and change in mental status or serious mood, cognitive or behavioral disturbance prohibiting her from participating in treatment in a less restrictive setting. There were no significant medical problems. She had no weight loss or evidence of physiologic instability.  There was no information indicating she was actively restricting, binging or purging. She was more motivated, generally adherent to her treatment plan, and engaged in therapeutic programming and developing coping skills. She was completing her daily tasks. Her parents were supportive, involved and engaged. Continued residential treatment structure and frequency was not medically necessary at that point for her mental health treatment and recovery. Her overall care could have continued at that point in a non 24 hour partial hospitalization setting, preferably near home, with individual therapy, family work and med management along with standard school adjustments. This would have helped to monitor and maintain her stability, continue to increase her functioning, develop a support system and further strengthen key relationships with friends and treatment professionals, while integrating her back into family and community life.

39. United wrote in its response to NYDFS that "the initial appeal was incorrectly handled as a provider appeal. As a result, an additional review was concluded on March 5, 2020. After review, UBH upheld the denial."

40. United did indeed send the Plaintiffs a letter dated March 5, 2020.[2] However this was not in any sense an "additional review." The letter simply changed the date of the original Kenneth Fisher letter but reused the original analysis nearly verbatim.

41. The letter raises serious concerns that United's statement that an additional review was performed was not only a misrepresentation to the Plaintiffs but also to NYDFS, the state regulatory authority. The March 5, 2020, letter is again signed by Dr. Fischer and states that, "I have completed a non-urgent appeal review on 03/05/2019 on a request we received on 11/15/2019." However, Dr. Fischer does not appear to have conducted any new analysis, and even in the event he did, ERISA specifically disallows reviewers who

---

[2] In fact, United sent the Plaintiffs two letters bearing this date. They were essentially identical however one letter denied payment from "05/18/2019- Forward" while the other denied payment for "05/18/2019 to 11/15/2019"

have previously been involved in the denial process to continue to participate in that process. Each reviewer must be previously uninvolved in the claims process, must consider all of the information presented regardless of whether this information had been previously considered, and the reviewer must not work for or report to an individual who has previously denied a claim.

42. Unless mitigating facts exist of which the Plaintiffs are not aware, it appears that either Dr. Fischer misrepresented the facts when he stated "I have completed a non-urgent appeal review on 03/05/2019," Dr. Fischer did conduct another "review" and simply changed the date of his initial decision, or another United entity changed the dates without Dr. Fischer's knowledge to offer the appearance that a new review took place when it had not. In any case, it appears that United made untruthful statements to NYDFS in its response to Plaintiffs' complaint when it represented that a new review was conducted on March 5, 2019.

43. Even more concerning is the fact that United sent the Plaintiffs another variation of the Dr. Fischer letter, this time dated April 6, 2020. For all intents and purposes, it was identical to the previous five Dr. Fischer letters with only minor changes, however it did make one substantive change when it reverted the statement "I have completed a non-urgent appeal review on 03/05/2019" to "I have completed a non-urgent appeal review on 12/17/2019"

44. It is unclear why, if Dr. Fischer had indeed performed a new review on March 5, 2019, as his signed statement attests, United would send out a letter dated April 6, 2020, which stated that the review was completed on December 17, 2019.

45. Apparently United, or someone acting on its behalf, attempted to mislead both the Plaintiffs and NYDFS into believing that another review was performed, when no such action was ever taken.

46. The April 6, 2020, letter was largely the same as the previous five Dr. Fischer letters, but as it is the most recent of these letters it is reproduced below, it stated in part:

> As requested, I have completed a non-urgent appeal review on 12/17/2019 on a request we received on 11/05/2019. …
>
> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and Common Criteria and Clinical Best Practices for all levels of care, it is my determination that no authorization can be provided for dates of service: 05/18/2019 forward. Your daughter admitted for the intensive treatment of her mood, behavior and eating related symptoms on 11/06/2018. Optum authorized care through 05/17/2019. As date of service 05/18/2019, [sic] she appeared to have made substantial progress in treatment. Her acute symptoms had been stabilized. There were no treatment plan or goals specific to her symptoms and behaviors that required ongoing 24-hour-a-day, 7-day-a-week supervision and care. The why now factors leading to her residential admission appeared to be able to at that point to be safely treated in a less intensive setting. She was noted to be generally more cooperative, responsive to staff, medication adherent, and doing better. She presented minimal acute behavioral management challenges. She was psychiatrically stable, with no report of self-harm, aggression, change in mental status or serious mood, cognitive or behavioral disturbance prohibiting her from participating in treatment in a less restrictive setting. There were no significant medical problems. She had no weight loss or evidence of physiologic instability. There was no information indicating she was actively restricting, binging or purging.
>
> She was more motivated, generally adherent to her treatment plan, and engaged in therapeutic programming and developing coping skills. She was completing her daily tasks. Her parents were supportive, involved and engaged. Continued residential structure and frequency was not medically necessary at that point for her mental health treatment and recovery. Her overall care could have continued at that point in a non 24-hour partial hospitalization setting, preferably near home, with individual therapy, family work and med management along with standard school adjustments. This would have helped to monitor and maintain her stability, continue to increase her functioning, develop a support system and further strengthen key relationships with friends and treatment professionals, while integrating her back into family and community life.

47. This letter was addressed to "Dear UR Department" and marks the SIXTH revision of the Kenneth Fischer denial. Three of which were erroneously stated to be a response to an appeal submitted by Elevations, two of which were described as a response to a member appeal and the last of which was addressed to an entity called the UR department.

48. On March 27, 2020, E.V. requested that the denial of payment for L.V.'s treatment be evaluated by an external review agency. E.V asked that the reviewer be appropriately qualified and that they take into account the information he had previously provided which included his level one appeal. He expressed concern that United had not referenced any of the clinical evidence he had provided and asked the external reviewer to present the specific clinical evidence reviewed.

49. In addition, E.V. again requested to be provided with a copy of the Plan Documents.

50. In a letter dated April 27, 2020, the external review agency upheld the denial of payment for L.V.'s treatment. The letter gave the following justification for the denial:

> By 05/17/2019, the patient did not present any behavioral issues which required 24-hour daily observation and treatment. Furthermore, the treatment as documented by this facility was purely behavioral in nature and does not reflect any psychological understanding of the reasons for the patient's behavior or give any reason to believe that the behaviors would not return outside of this controlled environment. This patient's problems would have been more effectively addressed in the real world setting of her community, with her family, in a less restrictive setting.

51. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

52. The denial of benefits for L.V.'s treatment was a breach of contract and caused E.V. to incur medical expenses that should have been paid by the Plan in an amount totaling over $110,000.

53. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of E.V.'s request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

54. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

55. United and the Plan failed to provide coverage for L.V.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

56. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

57. As outlined supra, United or its representatives engaged in practices which were inconsistent with its statutory and fiduciary duties.

58. In summary, United initially denied payment in a letter dated May 21, 2019, attributed to Dr. Linda Gordon. This denial was appealed by Plaintiffs on November 11, 2019. Although Plaintiffs appealed the entire denied portion of L.V.'s treatment, United arbitrarily split the treatment dates and assigned them to two separate reviewers.

59. One reviewer, Dr. Neil Satten denied payment in a letter dated December 12, 2019, after claiming to have performed a review of the Plaintiffs' appeal. Dr. Satten's "review" appears to consist of copy and pasting Dr. Gordon's review with no indication that any further analysis was conducted.

60. Plaintiffs also received two denial letters addressed to Elevations, each dated December 17, 2019 and each signed by Dr. Kenneth Fischer. Plaintiffs then submitted a complaint on March 2, 2020, to NYDFS detailing among other things, that United had arbitrarily split the appeal dates and had tried to pass off denial letters as new by simply changing the dates.

61. Plaintiffs then received three additional letters dated March 5, 2020, again signed by Dr. Fischer. One was addressed to Elevations, the other two to Plaintiffs. These letters include a signed statement by Dr. Fischer that an additional review was conducted on March 5, 2020. This additional "review" appears to be Dr. Fischer's original review with the dates changed.

62. On March 9, 2020, United responded to NYDFS and admitted that there were issues in the appeal process however "**an additional review was concluded on March 5, 2020**" (emphasis added). After receiving this assurance that an additional review was performed NYDFS informed the Plaintiffs on March 19, 2020 that it was unable to further assist.

63. Plaintiffs then received a sixth denial letter dated April 6, 2020, once again signed by Kenneth Fischer which was largely the same as the other five, except it reverted the review date to December 17, 2019.

64. Finally, the Plaintiffs requested an evaluation by an external review agency and the denial was upheld.

65. United and the agents of the Plan breached their fiduciary duties to L.V. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in L.V.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of L.V.'s claims.

66. The actions of United and the Plan in failing to provide coverage for L.V.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

67. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

68. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

69. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

70. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on

medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

71. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

72. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for L.V.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

73. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. United and the Plan evaluated L.V.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

74. Plaintiffs have identified specific examples of disparate application of medical necessity criteria between medical/surgical and mental health treatment. The first was the allegation that United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that L.V. received.

75. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "She presented minimal acute behavioral management challenges. She was psychiatrically stable, with no report of self-harm, aggression, change in mental status or serious mood, cognitive or behavioral disturbance… ." This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that L.V. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

76. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

77. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

78. In addition, as specified in paragraph 26 above, Plaintiffs alleged that United had not

required L.V. to meet acute level criteria until after it elected to deny care. Plaintiffs

contended that it was nonsensical for Defendants to deny payment based on a lack of

acute symptoms when it had never objected to a lack of acute symptoms during the time

it approved coverage for L.V.'s treatment. Plaintiffs cited the *Dominic W.* case as an

example of an insurer engaging in this same behavior and being reprimanded by the

court for it.

79.  Plaintiffs identified another example of the Plan's improper application of its criteria to

evaluate the treatment L.V. received, namely that United required individuals receiving

treatment in residential treatment centers to satisfy a variety of different factors listed

only in proprietary criteria for treatment to be approved, but United does not appear to

have any such criteria for analogous medical or surgical providers like skilled nursing

facilities.

80. Plaintiffs alleged that United could not require residential treatment facilities to meet

specific criteria when it not only exempted medical or surgical facilities from these

requirements but appeared to have no proprietary criteria for these facilities at all. Among

the items Plaintiffs requested in the Plan Documents were criteria for medical or surgical

facilities, which if they had been provided, would have either shown Plaintiffs they were

mistaken in this allegation or allowed them to allege it more fully. United failed or

refused to supply the Plaintiffs with a copy of the Plan Documents.

81. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of

the Plan and the medical necessity criteria utilized by the Plan and United, as written or

in operation, use processes, strategies, evidentiary standards, or other factors to limit

coverage for mental health or substance use disorder treatment in a way that is

inconsistent with, and more stringently applied, than the processes, strategies, evidentiary standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

82. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

83. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

84. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.    Judgment in the total amount that is owed for L.V.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.    Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.    Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.    For such further relief as the Court deems just and proper.

DATED this 10th day of September, 2021.


By _____ s/ Brian S. King _____
          Brian S. King
          Attorney for Plaintiffs



County of Plaintiffs' Residence:
Morris County, New Jersey